# In the United States Court of Federal Claims

**No. 05-1311C**
**FILED: January 30, 2007**

| | | |
|---|---|---|
| **ROBIN C. BROOKINS,** | | |
| **Plaintiff,** | | |
| **v.** | | **Military Pay; Jurisdiction; Voluntariness; Waiver of Sanctuary, 10 U.S.C. § 12686(b); Motion to Dismiss.** |
| **UNITED STATES,** | | |
| **Defendant.** | | |

**STEPHEN C. GLASSMAN**, Glassman & Bullock, Vienna, Virginia, for the plaintiff.

**LAUREN S. MOORE**, Trial Attorney; **DAVID M. COHEN**, Director, Commercial Litigation Branch, Civil Division; **PETER D. KEISLER**, Assistant Attorney General, Department of Justice, Washington, D.C., for the defendant. Major **ANTHONY C. WILLIAMS**, Office of The Judge Advocate General, United States Marine Corps, Department of the Navy, Washington, D.C., of counsel.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Originally, Colonel (COL) Robin C. Brookins brought suit in this court on December 15, 2005. An amended complaint, however, was filed on May 18, 2006 to assert the Military Pay Act, 37 U.S.C. § 204 (2000), as the relevant money-mandating statute. At the request of the plaintiff, due to an anticipated, career decision point for the plaintiff, the court

issued a bench decision to the parties on August 1, 2006. This written opinion memorializes that opinion in writing.

Plaintiff requests the court to set aside the Secretary of the Navy's (SECNAV) decision rejecting the Board for Correction of Naval Records' (BCNR's) recommendation to permit plaintiff to claim "sanctuary," pursuant to 10 U.S.C. § 12686(a) (2000 & Supp. I 2005), thereby allowing her to become eligible for a 20-year, active duty retirement.

COL Brookins joined the United States Marine Corps Reserve as a Second Lieutenant on December 10, 1976. During her career as a reservist, she was promoted to Lieutenant Colonel (LT COL) in 1997, and was promoted to full Colonel in the reserves in 2003. Then LT COL Brookins was the officer in charge of the Camp Lejeune Tax Center, in North Carolina, when Headquarters, Marine Corps (HQMC) denied her request for further Active Duty for Special Work orders to continue at the Tax Center through May 26, 2000. Granting the Active Duty for Special Work order would have resulted in then LT COL Brookins accumulating more than 18 years of active duty service and, therefore, would have rendered her eligible to claim sanctuary, pursuant to 10 U.S.C. § 12686(a).[1] According to the Marine Corps Reserve Administrative Management Manual (MCRAMM), MCO P1001R.1, ¶ 3109.2(a-b) (Mar. 10, 1999), requests by a reservist or field units for active duty orders which will cause the service member's total active duty to exceed 18 years will not normally be approved, unless the service member has signed a waiver of sanctuary provision.

COL Brookins' command made a request that HQMC issue active duty orders permitting her to remain as the officer in charge of the Camp Lejeune Tax Center. Her command considered her the only qualified officer available with the knowledge and experience to assist 142,000 active duty personnel, their families and a large retirement community with their year 2000 tax returns. A number of documents in the administrative record, including an e-mail sent by LT COL John F. Feltham to HQMC, on January 24, 2000 reflected then LT COL Brookins' willingness to waive sanctuary for the purpose of serving as the Officer in Command at the Tax Center for the 2000 tax year. In that e-mail, LT COL Feltham cited earlier e-mail correspondence with then LT COL Brookins, in which plaintiff had written:

---

[1] The statute provides that "[u]nder regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system (other than the retirement system under chapter 1223 of this title), may not be involuntarily released from that duty before [s]he becomes eligible for that pay, unless the release is approved by the Secretary." 10 U.S.C. § 12686(a). The referenced chapter 1223 is titled, "Retired Pay for Non-Regular Service," which provides for the retirement of reservists at age 60, if sufficient points have been earned. <u>See</u> 10 U.S.C. §§ 12731, 12732 (2000 & Supp. I 2005).

> I have been faithfully signing the waivers [of sanctuary] for many sets of ADSW [Active Duty Special Work] and I have absolutely no problem with continuing to sign them. I have been "faithfully" signing the waiver with the understanding I could continue until service limitation (I understand it to be 28 years of commissioned [service] as a LtCol and possibly longer if I were fortunate enough to be promoted.) I am very much aware that I will not receive retirement until age 60 . . . .

On March 3, 2000, then LT COL Brookins accepted orders for active duty during the period from February 28, 2000 to May 26, 2000. These orders were issued, by direction, from the Commanding General, Marine Corps Reserve Support Command, and included a provision which stated:

> I voluntarily accept these orders to active duty for special work. In doing so, I understand that I may become eligible for sanctuary zone protection under Title 10, United States Code, section 12686(a). As a condition to acceptance of these orders, however, pursuant to section 12686(b), I hereby waive the applicability of section 12686(a) to the period of active duty covered by these orders. I understand that the effect of this waiver is to remove any sanctuary zone protection that might have otherwise applied as a result of the execution of these orders.

Although the record does not contain a signed copy of then LT COL Brookins' orders, the parties included an unsigned copy of the orders in the record, containing this waiver of sanctuary provision, and agreed that plaintiff accepted these orders. In fact, in her "Plaintiff's Counter-Statement of Facts and Proposed Additional Facts," she wrote "Agreed" to defendant's paragraph 5 which stated: "After discussion, Ms. Brookins verbally agreed to waive sanctuary as she had done in the past, and accepted orders that contained the waiver." Plaintiff now argues, however, that HQMC did not have the authority to require a waiver of sanctuary protection without authorization from the SECNAV and, therefore, that she had not effectively waived her sanctuary protection pursuant to 10 U.S.C. § 12686(b).

The Active Duty for Special Work orders required then LT COL Brookins to report to active duty on February 28, 2000, and stated that her release date from active duty would be on May 26, 2000. Furthermore, in compliance with her Active Duty for Special Work orders, then LT COL Brookins filed and executed a Separation/Travel Pay certificate upon her release. According to HQMC, then LT COL Brookins had accumulated 18 years, 3 months, and 21 days of active duty at the time of the end of her active duty tour, on May 26, 2000.

Subsequently, on July 17, 2001, COL Brookins applied to the BCNR pursuant to 10 U.S.C. § 1552 (2000), requesting that her Official Military Personnel file be corrected to

reflect that she was still on active duty status, asserting that she had not consented to leave active duty on May 26, 2000, at the conclusion of her tour at Camp Lejeune, and that no “Certificate of Release or Discharge from Active Duty” had been issued. In her complaint, she requests that she be returned to active duty until eligible to retire with 20 years of active duty service.

The BCNR requested and received military service inputs to assist the Board in deciding the plaintiff’s case. Each of these service inputs recommended that then LT COL Brookins’ request for relief be denied. A written input from the Naval Reserve Affairs Personnel Management Branch, dated August 14, 2001, characterized then LT COL Brookins’ separation as voluntary because she had not requested sanctuary prior to her release from active duty. Specifically, the input noted that then LT COL Brookins “did not request retention on active duty under Title 10 U.S.C. section 12686. Further, the first notice to the Marine Corps of LtCol Brookins [sic] request for sanctuary is contained in the current BCNR request,” dated July 17, 2001. Further, the reserve personnel office suggested that, "[t]o allow LtCol Brookins to return to active duty solely for retirement eligibility is against Title 10 U.S.C. section 12735, would conflict with statute, service policy and would raise equity issues with other Marines."

The Naval Reserve Affairs Personnel Management Branch also provided a second written input to the BCNR, dated November 2, 2001, similarly recommending that COL Brookins’ request for sanctuary be denied because HQMC's approval for her to perform Active Duty for Special Work was "[b]ased on Lieutenant Colonel Brookins [sic] word as an officer that her intent was not to declare sanctuary," and that she was “well aware of her situation.” Moreover, the reserve personnel office stated that when then LT COL Brookins executed a Separation/Travel Pay Certificate dated May 3, 2000, and turned in her Active Duty military identification card, as part of her discharge processing, she was aware of her “End of Active Service” date and indicated acceptance of her voluntary release.

In another written input to the BCNR, dated March 29, 2002, the Staff Judge Advocate to the Commandant of the Marine Corps recommended denying COL Brookins’ request for sanctuary because, by taking the equivalent of “terminal leave” as the end of her active duty tour and by not presenting herself for duty after her release on May 26, 2000, she thereby indicated that she left active duty consistent with her orders, and voluntarily. The Staff Judge Advocate’s written input stated that:

> Reference (a) [10 U.S.C. § 12686] does not authorize, and Lieutenant Colonel Brookins is not now entitled, to claim sanctuary for a *previous* period of active duty . . . . Her time to claim sanctuary has long passed. And even had she claimed sanctuary while on active duty, granting her request would have been problematic because of her exhaustive, explicit, and persuasive assertions that she would not claim sanctuary as a condition precedent to accepting orders.

(emphasis in original).

In a May 9, 2002, submission to the BCNR, then LT COL Brookins responded to some of the issues raised. She stated that she had not asked for sanctuary because of the waiver clause contained in all of the Active Duty for Special Work orders. Then LT COL Brookins further stated that she anticipated future Active Duty for Special Work orders, also based on waivers of sanctuary, in accordance with past practice. In response to the assertion that the time to claim sanctuary had long passed, plaintiff stated that she thought she had three years to request corrections to her records through the BCNR, which had not yet expired.[2] In response to the assertion that she did not present herself for active duty after May 26, 2000, COL Brookins listed numerous non-active duty military activities she had participated in since May 26, 2000 (which are not counted toward an active duty military retirement and, therefore, do not require a waiver of sanctuary).

On September 12, 2002, a three-member panel of the BCNR recommended granting then LT COL Brookins' July 17, 2001, petition for relief. The BCNR concluded that then LT COL Brookins

> had over 18 years of active duty service when she accepted the last period of active duty,[3] and was required to sign a waiver of the sanctuary provision in order to reach that length of service. Additionally, she requested and was granted further ADSW orders only by agreeing to another waiver. HQMC has previously opined that since the authority to require such a waiver has not been delegated to HQMC by SECNAV, the waiver of sanctuary may not be legally enforceable. The Board

---

[2] Although plaintiff does not cite a specific statute or regulation, she may be referring to 32 C.F.R. § 723.3(b) (1999), which provides that applications for correction of military records must be filed within three years after discovery of the alleged error or injustice. Plaintiff signed her active duty orders on March 3, 2000 and filed her complaint with the BCNR on July 17, 2001.

[3] Both parties agree that this BCNR statement concerning COL Brookins' years of service is incorrect. According to her "Certificate of Release or Discharge from Active Duty" (DD Form 214), COL Brookins had served on active duty for 17 years, 11 months, and 4 days prior to accepting the Active Duty for Special Work orders on March 3, 2000, not more than 18 years, as stated by the BCNR. The government asserts that the BCNR's statement that COL Brookins had already accumulated 18 years of active duty before signing the waiver of sanctuary was the basis of its favorable recommendation. However, this erroneous statement, contained on page 3 of the BCNR's recommendation, is inconsistent with the BCNR's statement on page 1 of its recommendation, which acknowledged that COL Brookins was required to sign a waiver "because she was approaching 18 years of active duty . . . ."

> has essentially agreed with this position in similar cases. Given the previous advisory opinions and actions of the Board, the Board believes that since the waiver was improper, the issue of whether or not her release from active duty was voluntary is essentially moot. The Board further believes that this reasoning applies to her assertion that she would not claim sanctuary in order to obtain the ADSW [Active Duty for Special Work] orders.

The BCNR recommended "that [COL Brookins'] naval record be corrected to show that she was not released from active duty on 26 May 2000, but continued to serve on active duty until the earliest date she qualified for a 20 year active duty retirement and was retired in the grade of LtCol."[4]

In accordance with 32 C.F.R. § 723.7 (1999), a designated representative of the Assistant Secretary of the Navy, Manpower and Reserve Affairs conducted an independent review of the BCNR's proceedings. The Assistant General Counsel, Manpower and Reserve Affairs, Joseph G. Lynch, conducted the independent review in plaintiff's case. On October 23, 2002, in a Memorandum to the Executive Director, Board for Correction of Naval Records, based on the "particular circumstances of this case," Mr. Lynch rejected the BCNR's sanctuary recommendation and denied COL Brookins' request for relief, because he was "not persuaded that petitioner's separation from active duty was involuntary as that term is used in 10 U.S.C. Sec. 12686(a)."

In a letter dated October 25, 2002, the Executive Director of the Board for Correction of Naval Records, W. Dean Pfeiffer, informed then LT COL Brookins of Mr. Lynch's decision, and advised her that the case would be reconsidered only upon the presentation of new and material evidence. On December 12, 2002, then LT COL Brookins submitted a written request for a complete copy of Mr. Lynch's independent review of the BCNR's recommendation, together with any additional information Mr. Lynch used in reaching his decision. Mr. Pfeiffer informed COL Brookins that "the only documentation he [Mr. Lynch] considered, when he decided to exercise his discretion and deny the Board's recommendation . . . was the [BCNR'S] Report of Proceedings . . . ."

Plaintiff then submitted a written request to Mr. Lynch for "both the rationale and any specific case or agency law utilized" in reaching his decision. On July 10, 2003, Assistant General Counsel, Manpower and Reserve Affairs, Robert T. Cali, Mr. Lynch's successor, responded to the request by forwarding "the attached documentation that memorializes Mr. Lynch's decision in your case." On August 15, 2003, COL Brookins submitted a written request to Assistant General Counsel Cali for reconsideration of the BCNR's recommendation. Mr. Cali responded on October 7, 2003, and advised COL Brookins that

---

[4] Ms. Brookins was promoted to full Colonel in the reserves in 2003, after she filed her application for relief with the BCNR.

further reconsideration within the Department of the Navy was “not appropriate” because “Mr. Lynch carefully considered the BCNR recommendation in conjunction with the information contained in the record.” Alternatively, Mr. Cali proposed that COL Brookins "seek judicial review in a court of competent jurisdiction."

## DISCUSSION

Plaintiff argues that the SECNAV’s decision to reverse the BCNR’s recommendation that plaintiff be permitted to serve on active duty until qualifying for a 20-year retirement, was a violation of the statutory provisions of 10 U.S.C. § 12686. Plaintiff asserts that when her active duty assignment came to an end on May 26, 2000, she should have been permitted to remain on active duty until eligible for the 20-year military retirement and, therefore, she argues that she was improperly released. Plaintiff requests that the court direct her return to active duty, with orders permitting her to remain on active duty until she attains eligibility for a 20-year active duty retirement; or, alternatively, that the court order the Navy to correct her records to reflect that she be deemed to have served on active duty for 20 years and, therefore, is eligible for a 20-year active duty retirement. Plaintiff also requests the back pay and allowances she claims are due to her prior to her retirement.

Defendant filed a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) and, in the alternative, a motion for judgment upon the administrative record. Plaintiff filed a cross-motion for judgment upon the administrative record.

### I. Money-Mandating Statute

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. See 28 U.S.C. § 1491 (2000). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Testan, 424 U.S.

392, 400, reh'g denied, 425 U.S. 957 (1976) (citing Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-06, 372 F.2d 1002, 1009 (1967)); see also Palmer v. United States, 168 F.3d at 1314; Stinson, Lyons & Bustamante, P.A. v. United States, 33 Fed. Cl. 474, 478 (1995), aff'd, 79 F.3d 136 (Fed. Cir. 1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." INS v. St. Cyr, 533 U.S. 289, 299 n.10 (2001); United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992); Ins. Co. of the West v. United States, 243 F.3d 1367, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (2001); Saraco v. United States, 61 F.3d 863, 864 (Fed. Cir. 1995) (quoting United States v. King, 395 U.S. 1, 4 (1969)), cert. denied, 517 U.S. 1166 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims; "'it does not create any substantive right enforceable against the United States for money damages.'" United States v. Mitchell, 445 U.S. 535, 538 (quoting United States v. Testan, 424 U.S. at 398-99), reh'g denied, 446 U.S. 992 (1980); White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001), aff'd, 537 U.S. 465 (2003); Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000), cert. denied, 532 U.S. 1065 (2001); New York Life Ins. Co. v. United States, 118 F.3d 1553, 1555-56 (Fed. Cir. 1997), cert. denied, 523 U.S. 1094 (1998); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 465 U.S. 1065 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. United States v. Mitchell, 445 U.S. at 538. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" White Mountain Apache Tribe v. United States, 249 F.3d at 1372 (quoting United States v. Mitchell, 463 U.S. 206, 216-17 (1983)); see also United States v. Testan, 424 U.S. at 400; Fisher v. United States, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005) (en banc); Tippett v. United States, 185 F.3d 1250, 1254 (Fed. Cir. 1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998), reh'g denied (1999))); Doe v. United States, 100 F.3d 1576, 1579 (Fed. Cir. 1996), reh'g and reh'g en banc denied (1997); Eastport Steamship Corp. v. United States, 178 Ct. Cl. at 607, 372 F.2d at 1009.

Plaintiff identifies the Military Pay Act, 37 U.S.C. § 204 (2000), as the relevant money-mandating statute. Section 204 provides that members of a uniformed service are entitled to basic pay and allowances. Accordingly, if plaintiff was improperly or involuntarily released from active duty, her statutory right to pay was not extinguished and she would be entitled to back pay and allowances. See Tippett v. United States, 185 F.3d at 1255; Adkins v. United States, 68 F.3d 1317, 1321 (Fed. Cir. 1995), reh'g denied (1996).[5]

[5] Defendant initially argued that plaintiff's claim should be dismissed for lack of jurisdiction because the complaint failed to even assert a money-mandating statute. Plaintiff's first amended complaint, however, asserted the Military Pay Act, 37 U.S.C. § 204, as the relevant money-mandating statute.

**II. Voluntary Separation from the Military**

In accordance with RCFC 12(b)(1), and confirmed by a long line of cases issued by the United States Court of Appeals for the Federal Circuit, if plaintiff's separation from the military was voluntary, no jurisdiction resides in the United States Court of Federal Claims. See Metz v. United States, 466 F.3d 991, 995 (Fed. Cir.), reh'g denied (2006); Carmichael v. United States, 298 F.3d 1367, 1371 (Fed. Cir. 2002) ("If a discharge from service is voluntary, then the Court of Federal Claims lacks jurisdiction to review the discharge or any back pay damages claims."); Tippett v. United States, 185 F.3d at 1255; Adkins v. United States, 68 F.3d at 1321; Sammt v. United States, 780 F.2d 31, 33 (Fed. Cir. 1985).

As the United States Court of Appeals for the Federal Circuit reasoned in Tippett:

> If Tippett's discharge was involuntary and improper, his statutory right to pay was not extinguished and thus serves as a basis for Tucker Act jurisdiction.
>
> See Adkins, 68 F.3d at 1321. If, however, Tippett's discharge was voluntary, his right to pay ended upon his discharge. He thus would have retained no statutory entitlement to compensation, and consequently no money-mandating provision would support Tucker Act jurisdiction over his claim.

Tippett v. United States, 185 F.3d at 1255; see also Sinclair v. United States, 66 Fed. Cl. 487, 491 (2005); Moody v. United States, 58 Fed. Cl. 522, 524 (2003); Gavin v. United States, 47 Fed. Cl. 486, 489 (2000) (noting that a plaintiff who voluntarily resigns from active duty in the armed services divests the Court of Federal Claims of jurisdiction), review dismissed, 25 Fed. Appx. 882 (Fed. Cir. 2001); Soeken v. United States, 47 Fed. Cl. 430, 434 (2000), aff'd, 20 Fed. Appx. 900 (Fed. Cir. 2001).

**a. Waiver of Sanctuary**

The applicable statute, 10 U.S.C. § 12686(a), provides that a reservist who is on active duty, with over 18 years of service for retirement purposes, shall be permitted to remain on active duty to complete the 20 years required to be eligible for active duty retirement pay. Upon accumulating 18 years of active duty service, a reservist has entered the "sanctuary zone" because he or she cannot be separated from active duty without secretarial approval. See 10 U.S.C. § 12686(a) ("[A] member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system (other than the retirement system under chapter 1223 of this title), may not be involuntarily released from that duty before [s]he becomes eligible for that pay, unless the release is approved by the Secretary."). Furthermore, 10 U.S.C. § 12686(b) provides that the SECNAV may require a waiver of the sanctuary zone privilege before active duty orders are issued to a reservist

who would reach 18 years of active duty service while on those orders. In its entirety, section 12686(b) states:

> With respect to a member of a reserve component who is to be ordered to active duty (other than for training) under section 12301 of this title pursuant to an order to active duty that specifies a period of less than 180 days and who (but for this subsection) would be covered by subsection (a), the Secretary concerned may require, as a condition of such order to active duty, that the member waive the applicability of subsection (a) to the member for the period of active duty covered by that order. In carrying out this subsection, the Secretary concerned may require that a waiver under the preceding sentence be executed before the period of active duty begins.

10 U.S.C. § 12686(b).

The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)); see also Transcapital Leasing Assocs., 1990-II, L.P. v. United States, 398 F.3d 1317, 1319-20 (Fed. Cir. 2005). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Id. (quoting Robinson v. Shell Oil Co., 519 U.S. at 340). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting Duncan v. Walker, 533 U.S. 167, 173 (2001)); Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. See Duncan v. Walker, 533 U.S. at 167 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976); see also Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir.), reh'g denied (2000).

When the statute provides a clear answer, the court's analysis is at an end. See Barnhart v. Sigmon Coal Co., 534 U.S. at 450; Transcapital Leasing Assocs., 1990-II, L.P. v. United States, 398 F.3d at 1320. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" Johnson v. United States, 529 U.S. 694, 723 (2000) (quoting United States v. Ron Pair Enterps., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence

of a contrary intent." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d 388, 391 (Fed. Cir.) (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and Darby v. Cisneros, 509 U.S. 137, 147 (1993)), reh'g denied, en banc suggestion declined (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d at 391 (citing INS v. Chadha, 462 U.S. 919 (1983)). "'[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" Shannon v. United States, 512 U.S. 573, 583-84 (1994) (quoting Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 712 (D.C. Cir. 1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. See Whitfield v. United States, 543 U.S. 209 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history . . . ."); Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'") (quoting Tidewater Oil Co. v. United States, 409 U.S. 151, 157 (1972)), reh'g and reh'g en banc denied (2004).

On March 3, 2000, the Commanding General, Marine Corps Reserve Support Command, issued active duty orders to plaintiff for the period of February 28, 2000 to May 26, 2000. See 10 U.S.C. § 12301(d) (2000).[6] The orders included a waiver of sanctuary provision. During this tour of duty, plaintiff could have accumulated over 18 years of active duty, rendering her eligible for sanctuary, if the waiver provision included in her orders were to be found invalid. Plaintiff asserts that the waiver provision was invalid and that the government violated 10 U.S.C. § 12686(b). According to the plaintiff, "[s]ince the Commandant cannot act on behalf of the Secretary of the Navy under the provisions 10 U.S.C. § 12686, his actions in requiring that the Plaintiff execute a waiver does not affect

[6] Section 12301(d) provides that: "[A]n authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member." 10 U.S.C. § 12301(d). The plaintiff does not distinguish between the Commandant of the Marine Corps and the Commanding General, Marine Corps Reserve Support Command, who actually issued the active duty orders to plaintiff containing a waiver of sanctuary provision. Pursuant to 32 C.F.R. § 700.206 (1999), the Commandant of the Marine Corps is authorized to organize, assign and reassign responsibilities within his respective commands. In the Marine Corps Reserve Administrative Management Manual, the Commandant specifies that the Commanding General, Marine Corps Reserve Support Command, is responsible for the assignment and separation of reserve personnel. See MCRAMM, MCO P1001R.1, ¶ 1005.5.

Plaintiff's right to sanctuary under the Statute." Further, plaintiff argues that the Secretary has two options when a reservist is approaching 18 years of active duty. First, pursuant to 10 U.S.C. § 12686(b), the SECNAV (or express delegate) "may require" a waiver of sanctuary before active duty orders are issued. Second, according to the plaintiff, if the SECNAV (or express delegate) does not require a waiver of sanctuary under section 12686(b), then there must be compliance with the provisions of 10 U.S.C. § 12686(a) and a reservist who has reached sanctuary cannot be involuntarily released from the service, prior to achieving 20 years of active duty service, unless the release is approved by the SECNAV. In another filing with the court, plaintiff states that "the Commandant of the Marine Corps unilaterally requested or required that the Plaintiff waive sanctuary in order to receive active duty orders." Therefore, plaintiff argues that her waiver of sanctuary was ineffective and legally unenforceable because the SECNAV had not delegated his authority to issue the waiver of sanctuary.

Defendant responds by asserting that 10 U.S.C. § 12686(b) provides for secretarial approval when the SECNAV is "requiring" a waiver of sanctuary as a condition of an order to active duty, but that secretarial approval is not required when the reservist requests a waiver of sanctuary. The defendant argues that: "it was not necessary for the Secretary of the Navy to intervene and require the waiver, because Ms. Brookins was willing to sign the waiver." At the time her active duty orders were issued, she readily agreed to sign the waiver of sanctuary, as she had signed such waivers in the past.

The applicable statutory language states that "the Secretary concerned[7] may require . . . that the member waive the applicability of subsection (a) [sanctuary zone protection] to the member . . . before the period of active duty begins." 10 U.S.C. § 12686(b). Similarly, according to the Marine Corps Reserve Administrative Management Manual, such a waiver must be executed and signed by reservists who are "approaching or have accrued 17 or more years of active duty" service, prior to the issuance of active duty orders. MCRAMM, MCO P1001R.1, ¶ 3109.2a. The issue presented is whether the statute, 10 U.S.C. § 12686, mandates that the SECNAV be involved in every single waiver of sanctuary provision included in the orders to active duty of a reservist who is approaching sanctuary status, as a condition precedent for the issuance of those active duty orders, or whether the statute permits a reservist to voluntarily sign a waiver provision without implicating the SECNAV. See 10 U.S.C. § 12686(b).

The phrase, the Secretary "may require," in 10 U.S.C. § 12686(b) reveals permissive language that does not appear to preclude a reservist from choosing to waive sanctuary, without the SECNAV's involvement. The legislative history of 10 U.S.C. § 12686(b) may be reviewed for the purposes of confirming the meaning of the words of the statute and "plac[ing] the words of [the] statute in their proper context." Tidewater Oil Co. v. United

[7] In plaintiff's case, the SECNAV is the Secretary who would require the waiver. See 32 C.F.R. § 700.101 (1999). Since plaintiff's release from active duty occurred on May 26, 2000, the applicable regulations are found in 32 C.F.R. Parts 700 to 799 (July 1, 1999).

States, 409 U.S. at 157. The legislative history of section 12686(b) indicates that Congress intended that reservists have the capability to waive sanctuary. The Senate Report states:

> The committee recommends a provision that would permit a reservist serving on active duty for less than 180 days to waive the applicability of the retirement sanctuary. The purpose of the waiver is to permit a reservist who, by virtue of his or her years of service, may qualify for the retirement sanctuary to serve on active duty for a period of less than 180 days, if he or she waives the retirement sanctuary.

National Defense Authorization Act for FY 1997, S. Rep. No. 104-267, § 514 (May 13, 1996). There is no indication in the legislative history of a requirement that the Secretary, in this case the SECNAV, must be involved in the processing of all waivers by reservists issued orders to active duty, who are approaching 18 years of service. The thrust of this legislative history reminds us that it is the service member who is provided with the waiver authority. Placing the burden on the service member also is reflected in the MCRAMM, MCO P1001R.1, ¶ 3109.2(a), which states as follows: "If the Marine chooses to waive the sanctuary provisions . . . , orders may be issued."

The plaintiff nevertheless asserts that there are several indications in the record that her waiver of sanctuary is not legally enforceable because it violates 10 U.S.C. § 12686(b). First, plaintiff points to the BCNR recommendation in her favor, dated September 12, 2002. The BCNR decision addressed plaintiff's position regarding the waiver by stating:

> HQMC [Headquarters of the Marine Corps] has previously opined that since the authority to require such a waiver [of sanctuary] has not been delegated to HQMC by SECNAV, the waiver of sanctuary may not be legally enforceable. The Board has essentially agreed with this position in similar cases. Given the previous advisory opinions and actions of the Board, the Board believes that since the waiver was improper, the issue of whether or not her release from active duty was voluntary is essentially moot. The Board further believes that this reasoning applies to her assertion that she would not claim sanctuary in order to obtain the ADSW orders.

Further, plaintiff relies on, and attaches to her complaint, two BCNR recommendations, rendered in earlier cases, brought by other individuals, both of which addressed the authority of the Marine Corps to issue waiver of sanctuary provisions. In the first BCNR decision, case no. 1348-02, dated May 22, 2002, the petitioner endorsed his active duty orders, including a waiver of sanctuary protection, but this occurred only after he had accumulated over 18 years of active duty and, therefore, had already entered the sanctuary zone. Subsequently, the petitioner was separated in accordance with his active duty orders and requested reinstatement. The BCNR recommended reinstatement.

Plaintiff cites BCNR case no. 1348-02 because one of the reasons listed by the Board in support of the service member was that the petitioner's "waiver of the sanctuary provisions was of no effect, since SECNAV has not authorized the Marine Corps to waive sanctuary protection." Plaintiff notes that the Assistant General Counsel, Manpower and Reserve Affairs, Mr. Lynch (the same official who overturned the BCNR recommendation issued in COL Brookins' case), also approved the decision in case no. 1348-02. However, on the copy of the BCNR opinion plaintiff attached to the complaint, Mr. Lynch only wrote "Approved," without any explanation, directly on a copy of the BCNR recommendation. In case no. 1348-02, the BCNR recommendation provides at least two other possible grounds for Mr. Lynch's concurrence and, therefore, is distinguishable from COL Brookins' case. First, in case no. 1348-02, the petitioner's waiver was "invalid per section 12686 . . . since the orders were for a period in excess of 179 days." See 10 U.S.C. § 12686(b) (allowing waivers of sanctuary in active duty orders "that specif[y] a period of less than 180 days...."). Second, in case no. 1348-02, the BCNR stated that, "[s]ince it appears that Petitioner entered the 18-year zone on or about March 1999 [and endorsed his orders with a sanctuary provision a month later], he should not have been released from active duty at the end of his ADSW [Active Duty for Special Work]." Therefore, in BCNR case no. 1348-02, it would appear that the petitioner already enjoyed vested sanctuary rights, which he subsequently was not required to waive.

Plaintiff also relies on a second BCNR case, no. 873-01, dated January 3, 2002. However, case no. 873-01 also is distinguishable because the Marine in that case refused to sign orders which required a waiver of sanctuary upon receiving updated Active Duty for Special Work orders taking him into the 18-year sanctuary zone. Subsequently, the petitioner was released from active duty. Although, in a footnote, the BCNR expressed concern "that the Secretary has not delegated waiver authority to the U.S. Marine Corps–which raises questions . . . whether waivers (as presently implemented) are enforceable," the Board ultimately decided that the Marine's release violated 10 U.S.C. § 12686(a). The Board noted that section prohibits releasing reservists from active duty without the Secretary's approval, once they are in the sanctuary zone. However, in BCNR case no. 873-01, since the petitioner did not sign a waiver provision, the validity of the waiver was not at issue. Therefore, both of these earlier BCNR recommendations are distinguishable from the present case, and not of assistance to the plaintiff.

As noted above, the Commandant of the United States Marine Corps issued a policy and instruction manual for the Marine Corps, titled Marine Corps Reserve Administrative Management Manual (MCRAMM), MCO P1001R.1J (Mar. 10, 1999). The policies and instructions of the MCRAMM were followed in the case of COL Brookins. Section 3109.2 of that Manual provides that:

> 2. Title 10 U.S.C., section 12686(b) provides the authority for a Reserve member on active duty to waive retirement sanctuary. This provision affords the Marine Corps the flexibility to bring a member of the RC [Reserve Corps] on active duty for up to 179 days even if those members are in, or

would enter, sanctuary (at least 18 years of active federal service) during the contemplated period of service. When conditions are that federal service through repeated use of short tours and becoming eligible for sanctuary protection, the following policy applies:

a. The COMMARFORRES [Command Marine Forces Reserve] and CG, MCRSC [Commanding General, Marine Corps Reserve Support Command], will monitor Reservists under their cognizance who are approaching or have accrued 17 or more years of active duty. If the Marine chooses to waive the sanctuary provisions as offered in paragraph 3109.2 above, orders may be issued. The following statement must be included in the Marine's orders and executed and signed by the Marine prior to issuance of orders:

> "I voluntarily accept these orders to Active Duty for Special Work. In doing so, I understand that I may become eligible for sanctuary zone protection under Title 10 U.S.C. section 12686(b), I hereby waive the applicability of Title [10] U.S.C. section 12686(a) to the period of Active Duty covered by these orders. I understand that the effect of this waiver is to remove any sanctuary zone protection that might have otherwise applied as a result of the execution of these orders."

<u>Under no circumstances will orders be issued until the Marine has signed the waiver</u>.

b. If the Marine does not choose to waive the sanctuary provisions and issuance of orders will cause the Marine to exceed 17 years of qualifying active federal service, COMMARFORRES [Command Marine Forces Reserve] or the CG, MCRSC [Commanding General, Marine Corps Reserve Support Command], as appropriate, will forward the request for orders to CMC (RA) [Commandant of the Marine Corps for Reserve Affairs] for approval.

(1) Requests for active duty other than for training, including ADSW [Active Duty for Special Work], which will cause the member's total active duty to exceed 18 years will not normally be approved.

(2) Exceptions may be granted by the CMC (RA) based on the needs of the Marine Corps.

MCRAMM, MCO P1001R.1, ¶ 3109 (emphasis in original).

This Manual provision provides a reservist with two possible ways to address waivers of sanctuary. First, a reservist may choose to waive the sanctuary provisions, in which case he or she may be issued active duty orders. See MCRAMM, MCO P1001R.1, ¶ 3109.2a. Second, if a reservist does not choose to waive sanctuary, he or she should give such notice to the Marine Corps. The request not to waive sanctuary is forwarded to the Commandant of the Marine Corps for Reserve Affairs for approval before the reservist is issued active duty orders permitting a claim of sanctuary, thus rendering the service member eligible for a 20-year active duty retirement. The MCRAMM states, however, that such requests "will not normally be approved." See MCRAMM, MCO P1001R.1, ¶ 3109.2b(1). From the provisions in the MCRAMM, the importance of waiver of sanctuary provisions is clear as is the conclusion that a reservist nearing retirement eligibility will be issued active duty orders, without a waiver, only after careful consideration and review of a request to claim sanctuary, and as an unusual action. The Manual does not require that the Secretary of the Navy be involved with all waivers of sanctuary, allows for choice on the part of the service member, and is consistent with the permissive language of 10 U.S.C. 12686(b) which states that the Secretary "may require" a waiver, but does not preclude a reservist from voluntarily waiving sanctuary before the issuance of an active duty assignment to the reservist.

Paragraph 3109 of the Marine Corps Reserve Administrative Management Manual, therefore, is consistent with the statutory language of 10 U.S.C. § 12686(b). See 10 U.S.C. § 12686(b); MCRAMM, MCO P1001R.1J, ¶ 3109. Moreover, the government's interpretation of 10 U.S.C. § 12686(b) is consistent with the general policies of the Reserve Corps and Active Duty for Special Work orders. "Every action taken to administer and manage the RC [Reserve Corps] should contribute to increased mobilization readiness by allowing for . . . mobilization readiness, and the reduction of administrative burdens." MCRAMM, MCO P1001R.1J, ¶ 3. "ADSW [Active Duty for Special Work] is designed to provide the Marine Corps with a means to utilize Reserve personnel on active duty to meet operational requirements . . . and to support short term, special projects and exercise participation supporting both the AC [Active Corps] and RC [Reserve Corps]." MCRAMM, MCO P1001R.1J, ¶ 3108. If, as plaintiff argues, the Secretary were to be required to approve each waiver of sanctuary for each reservist approaching the sanctuary zone, the flexibility for mobilization readiness would be reduced and the administrative burdens on the SECNAV seriously increased.

**b. Chevron/Mead Analysis**

The parties did not discuss this case in the context of a Chevron or Mead analysis, even though the court is presented both with a statute and implementing agency policies and instructions, raising, as discussed below, the questions of the propriety of agency

interpretation, and deference to the agency. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (footnote omitted), reh'g denied, 468 U.S. 1227 (1984); United States v. Mead Corp., 533 U.S. 218, 226-31 (2001); see also Caribbean Ispat Ltd. v. United States, 450 F.3d 1336, 1340 (Fed. Cir. ), reh'g denied (2006); Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1365-66 (Fed. Cir. 2005). The statute, 10 U.S.C. § 12686(b), provides that the Secretary, as a condition to a reservist being issued orders to active duty, and accumulating during that particular tour of duty over 18 years of service for active duty retirement purposes, "may require" that the reservist first waive the 18-year "sanctuary" before the active duty orders are issued. See 10 U.S.C. § 12686(a), (b). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843-44 (footnote omitted). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. at 226-27.

Chevron deference requires that a court ask two questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842. If congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43 (footnote omitted). If the statute is silent, however, or if Congress has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." Id. at 843 (footnotes omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." Id. at 843 n.11 (citations omitted). However, "[d]eference does not mean acquiescence." Presley v. Etowah County Comm'n, 502 U.S. 491, 508 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." Rust v. Sullivan, 500 U.S. 173, 184 (1991) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43).

The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

By statute, the Secretary of the Navy may delegate the authority to issue active duty orders to reservists. See 10 U.S.C. § 12301(d) (2000) ("At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty . . . ."). The Commandant of the Marine Corps is the senior officer of the United States Marine Corps. See 32 C.F.R. § 700.401 (1999). The Commandant of the Marine Corps is empowered to issue orders in order to carry out the responsibilities and duties delegated to the Commandant by the Secretary of the Navy's regulations, including orders specifically addressing reserve personnel. See 32 C.F.R. §§ 700.403(a)-(c) (1999). Section 700.403(a) states:

> (a) The Commandant of the Marine Corps, under the direction of the Secretary of the Navy, shall command the United States Marine Corps, which shall include Headquarters, United States Marine Corps; the Operating Forces of the Marine Corps; Marine Corps Supporting Establishments and the Marine Corps Reserve.

32 C.F.R. § 700.403(a). Further, the Commandant's responsibilities are identified as follows:

> To plan for and determine the present and future needs, both quantitative and qualitative, for personnel, including reserve personnel and civilian personnel, of the United States Marine Corps. This includes responsibility for leadership in maintaining a high degree of competence among Marine Corps officers and enlisted personnel and Marine Corps civilian personnel in necessary fields of specialization through education, training, and equal opportunities for personal advancement; and for leadership in maintaining the morale and motivation of Marine Corps personnel and the prestige of a career in the Marine Corps.

32 C.F.R. § 700.404(e).

Section 700.403(b) also provides that:

> The Commandant of the Marine Corps advises the Secretary of the Navy on matters pertaining to the Marine Corps. He is directly responsible to the Secretary for the administration, discipline, internal organization, training, requirements, efficiency and readiness of the Marine Corps . . . and the total performance of the Marine Corps. He . . . is responsible to the

> Secretary for the utilization of resources by and the operating efficiency of all activities under his command . . . .

32 C.F.R. § 700.403(b).

The court finds that the Commandant, who has been delegated the authority by the SECNAV to manage the Marine Corps, including Marine reservists, 1) may issue active duty orders "to provide the Marine Corps with a means to utilize Reserve personnel on active duty to meet operational requirements," but is not required to issue any given active duty orders to reservists; 2) may permit reservists to voluntarily choose to waive sanctuary; and 3) if reservists do not voluntarily choose to waive sanctuary, the Commandant may forward the request for active duty orders through channels for further review, and approval or disapproval, or active duty orders need not necessarily be issued to the reservists. The Commandant of the Marine Corps issued the MCRAMM, which reflects these reserve, force management, personnel policies. See MCRAMM, MCO P1001R.1J, ¶¶ 3108, 3109.

The MCRAMM states that it was compiled from Title 10, United States Code (which includes the section 12686 sanctuary provisions), and Department of Defense and Secretary of the Navy Instructions. See MCRAMM, MCO P1001R.1J, ¶ 2. The MCRAMM provides that for those Reservists who have accrued 17 or more years of active duty service, "[u]nder no circumstances will orders be issued until the Marine has signed the waiver [of sanctuary]." MCRAMM, MCO P1001R.1J, ¶ 3109.2a (emphasis in original). According to the record in this case, then LT COL Brookins was offered the option to waive sanctuary, did waive the 18-year sanctuary, and only then was issued active duty orders, which, in fact, did take her over the 18-year mark of active duty service. In this regard, her active duty orders contained a statement consistent with the following statement, prescribed by the MCRAMM:

> I voluntarily accept these orders to Active Duty for Special Work. In doing so, I understand that I may become eligible for sanctuary zone protection under Title 10 U.S.C. section 12686(b), [sic] I hereby waive the applicability of Title [10] U.S.C. section 12686(a) to the period of Active Duty covered by these orders. I understand that the effect of this waiver is to remove any sanctuary zone protection that might have otherwise applied as a result of the execution of these orders.

MCRAMM, MCO P1001R.1J, ¶ 3109.2a (Mar. 10, 1999).

Plaintiff argues, however, that because the SECNAV Instruction 1920.6B, "Administrative Separation of Officers," addressed 10 U.S.C. § 12686(a), prohibiting the involuntary release of a service member who has attained 18 years of active duty service, but did not address waivers of sanctuary, it "must compel the conclusion that there was no delegation of authority by the Secretary to the Commandant . . . ." Plaintiff further argues that the Secretary specifically intended not to make such a delegation. Moreover,

according to the plaintiff, in SECNAV Instruction 1920.6B, "the Secretary defines [in the SECNAV Instruction] who has the releasing authority regarding release from active duty of Marine Corps Officers." See SECNAV Instruction 1920.6B, encl. 3, ¶ 8b(3) (Dec. 13, 1999).[8] The plaintiff asserts that since the SECNAV issued the above paragraph pertaining to 10 U.S.C. § 12686, if the Secretary had intended to implement a broader policy pertaining to waivers of sanctuary, he would have done so.

Plaintiff also directs the court's attention to a difference between the Navy and the Air Force as to how sanctuary waivers are administered. In Air Force Instruction 36-2131, "Administration of Sanctuary in the Air Reserve Components," the Secretary of the Air Force has specifically delegated authority to issue waivers of sanctuary to the Headquarters Air Reserve Personnel Center. According to the Instruction: "The Secretary of the Air Force requires members who are in, and members whose upcoming tour would qualify them for sanctuary protections, to affirmatively waive the applicability of 10 U.S.C. § 12686(a)." Air Force Instruction 36-2131, "Administration of Sanctuary in the Air Reserve Components," ch. 3, ¶ 1 (Jan. 17, 2003). Furthermore, the waiver of sanctuary that each Air Force reservist is required to sign provides that the reservist "understand [that] neither my waiver submitted here nor any order requiring me to perform further voluntary service on AD [Active Duty] is effective until and unless this waiver is approved in writing by HQ ARPC/CC (USAFR) [Headquarters Air Reserve Personnel Center (United States Air Force Reserve)], as delegated by the SAF [Secretary of the Air Force]." Air Force Instruction 36-2131, atch 3, "Statement of Understanding: Waiver of Active Duty (AD) Sanctuary," ¶ 4.

The plaintiff asserts that because the Secretary of the Air Force specifically delegated authority in an Air Force Instruction, this indicates that the SECNAV did not intend to do so. While the plaintiff can point to more specific direction in the Air Force's procedures, it does not resolve the plaintiff's claim, as a member of the Marine Corps, not the Air Force. The Marine Corps Reserve Administrative Management Manual, and the other directives discussed above, which were followed in COL Brookins' case, are the relevant directives, and are dispositive. The court also is mindful that "[s]trong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters." Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (1979) (citing Orloff v. Willoughby, 345 U.S. 83 (1953)).

The United States Supreme Court has stated:

---

[8] Paragraph 8b(3) states that: "Under section 12686 of reference (a) [10 U.S.C.], a Reserve officer who is on active duty (other than for training) and is within 2 years of becoming eligible for retired pay under a purely military retirement system shall not be involuntarily released from that duty before he or she becomes eligible for that pay, unless his or her release is approved by the Secretary." SECNAV Instruction 1920.6B, encl. 3, ¶ 8b(3) (Dec. 13, 1999).

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," Chevron, 467 U.S., at 843-844, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. See id., at 844; United States v. Morton, 467 U.S. 822, 834 (1984); APA, 5 U.S.C. §§ 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" Bragdon v. Abbott, 524 U.S. 624, 642 (1998) (quoting Skidmore, 323 U.S., at 139-140), and "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." Chevron, supra, at 844 (footnote omitted); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980); Zenith Radio Corp. v. United States, 437 U.S. 443, 450 (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see Skidmore, supra, at 139-140.

United States v. Mead Corp., 533 U.S. 218, 227-28 (2001) (footnotes omitted).

Relevant to the case before the court, section 12686 provided that the Secretary may prescribe regulations, however, there is no indication that either the above-cited Secretary of the Navy Instruction, or the Commandant's Marine Corps Manual, were issued as a result of formal rulemaking. See 10 U.S.C. § 12686(a). The absence of formal rulemaking does not end the matter. As the Supreme Court also observed in Mead:

> [T]he overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication. That said, and as significant as notice-and-comment is in pointing to Chevron authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for Chevron deference even when no such administrative formality was required and none

> was afforded, see, e.g., NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-257, 263 (1995).

United States v. Mead Corp., 533 U.S. at 230-31 (footnote omitted); see also Caribbean Ispat Ltd. v. United States, 450 F.3d at 1340 (noting that "Chevron deference is not strictly limited to agency decisions that are the result of formal rulemaking or adjudication . . . .").

The United States Court of Appeals for the Federal Circuit in Killeen v. Office of Personnel Management, noted that deference under Chevron "is only warranted where Congress authorized an agency to make rules carrying the force of law, and the agency has exercised that authority." Killeen v. Office of Pers. Mgmt., 382 F.3d 1316, 1321 (Fed. Cir. 2004) (citing United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)). Continuing, however, the Federal Circuit, citing Mead, stated:

> Where Chevron does not apply, the agency's interpretation may still be afforded some deference according to a variety of factors to be considered by a reviewing court. See [United States v. Mead Corp., 533 U.S.] at 228, 121 S. Ct. 2164 (citing Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). These factors include "the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." Mead Corp., 533 U.S. at 228, 121 S. Ct. 2164 (citations omitted).

Killeen v. Office of Pers. Mgmt., 382 F.3d at 1321 (citations and text omissions in original).

The Supreme Court noted in Mead that looking to an agency's care, consistency, formality, and relative expertness in its interpretation of a statute has produced "a spectrum of judicial responses, from great respect at one end, see, e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389-390 (1984) ('substantial deference' to administrative construction), to near indifference at the other, see, e.g., Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212-213 (1988) (interpretation advanced for the first time in a litigation brief)." United States v. Mead Corp., 533 U.S. at 228; see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d at 1365-66 (applying Mead test to International Trade Commission's interpretation of the Byrd Amendment). Applying the Mead test, this court finds the waiver provisions at issue in the Marine Corps Reserve Administrative Management Manual (MCRAMM) warrant substantial deference. Specifically, substantial deference is accorded to the MCRAMM provisions, which in the normal case (and in the case of COL Brookins), require a waiver from a reservist before active duty orders are issued, if the reservist would exceed 18 years of active duty service on the tour in question, and thereby become eligible for a 20-year, active duty retirement, even though a reservist and eligible for the retirement formula tailored to reservists.

The court is mindful of the context in which the MCRAMM was issued, and implemented. The military has a retirement system for the full-time, active duty force, and

a retirement system for the reserve force. The active duty service members typically are eligible for retirement after 20 years of full-time, active duty service; reservists typically are eligible for retirement, if they have accumulated sufficient points toward retirement, at age 60.[9] The Marine Corps Reserve Administrative Management Manual, which states that "[u]nder no circumstances will orders be issued until the Marine has signed the waiver [of sanctuary]," is designed to preserve the distinction between the two retirement systems, one for full-time, active duty personnel, and the other for reserve personnel, who perform inactive duty training and who serve on active duty periodically and intermittently. MCRAMM, MCO P1001R.1J, ¶ 3109.2a (emphasis in original).

The Marine Corps Reserve Administrative Management Manual was in place well before the present case arose, and had been applied to COL Brookins' active duty tours, including the one at issue. According to the record, COL Brookins had on numerous occasions accepted active duty tours with the waiver provision included. Plaintiff has not argued that COL Brookins was singled out for special adverse treatment, or that the waiver of sanctuary provisions were placed only in her active duty orders, as opposed to their placement in the active duty orders of reservists generally whose active duty tour would take them past the 18-year active duty service mark. The Marine Corps Manual promotes consistency in the application of the waiver of sanctuary policy to reservists, and plaintiff has not demonstrated an inconsistent application of the policy only to herself. Further, the waiver of sanctuary provisions in the Marine Corps Reserve Administrative Management Manual, contained in a section titled, "Screening Personnel to Preclude AD [Active Duty] in Excess of 18 Years Active Federal Service," are part of a detailed, 244-page document (the MCRAMM), reflecting the complexity of managing a large force of reserve personnel. The provisions reflect that considerable care went into the drafting of the waiver of sanctuary provisions, which prescribe the inclusion of a detailed waiver statement in all active duty orders for reservists who "are approaching or have accrued 17 or more years of active duty." MCRAMM, MCO P1001R.1J, ¶ 3109.2a.

The matter of sanctuary and waiver and of military retirement systems constitutes a specialized area of military personnel and force management, including issues related to personnel morale and budget considerations, all of which depend on considerable military expertise necessary for decision making. This is not an area in which courts have any special expertise, nor is this an area into which courts have normally intruded. The United States Supreme Court has confirmed that "judges are not given the task of running the Army. . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian." Orloff v. Willoughby, 345 U.S. 83, 93, 94, reh'g denied, 345 U.S. 931 (1953); see also Porter v. United States, 163 F.3d 1304, 1316 (Fed. Cir. 1998), cert. denied, 528 U.S. 809 (1999). It is important to remember that "strong policy

[9] Compare 10 U.S.C. § 6323(a)(1) (2000) (permitting an officer of the Navy or Marine Corps to claim retirement pay after 20 years of active duty service), with 10 U.S.C. § 12731(a) (requiring a reservist to wait until he or she is "at least 60 years of age" to claim retirement pay).

reasons compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.'" Voge v. United States, 844 F.2d 776, 782 (Fed. Cir. 1988) (quoting Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (1979)), cert. denied, 448 U.S. 941 (1988). This court should not interfere with personnel and deployment decisions by the uniformed services, except to ensure that the decision maker has complied with applicable law and established procedures set forth in applicable statutes, regulations, rules, and procedures. See Orloff v. Willoughby, 345 U.S. at 94; see also Fisher v. United States, 402 F.3d 1167, 1177 (Fed. Cir. 2005) (en banc); Sargisson v. United States, 913 F.2d 918, 921-22 (Fed. Cir.), reh'g denied (1990).

Returning to a Chevron analysis, and whether Congress has "directly spoken to the precise question at issue," that is, whether the intent of Congress is clear on the issue, or whether the statute is silent or ambiguous on the matter, 10 U.S.C. § 12686(b) provides that a reservist may be required to waive the 18-year sanctuary, before active duty orders are issued. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43. Although the Secretary may require a waiver, the statute does not require an orders-issuing official, such as the Commandant of Marine Corps, to issue orders in the first place, or preclude an orders-issuing official from requiring a waiver of sanctuary before issuance of active duty orders or from allowing a service member to voluntarily offer to waive sanctuary. For the above reasons, consistent with the guidance of the United States Supreme Court guidance in Mead, this court gives substantial deference to the waiver of sanctuary provisions in the Marine Corps Reserve Administrative Management Manual, which were properly applied to COL Brookins' active duty tour at issue.

After reviewing the relevant statute, the Code of Federal Regulations sections, and Secretary of the Navy Instructions, the court finds that the Commandant of the Marine Corps was authorized by the Secretary of the Navy to issue the MCRAMM and to implement the sanctuary provisions of 10 U.S.C. § 12686 for reserve personnel, such as COL Brookins. Since the court finds plaintiff's waiver of sanctuary legally enforceable, plaintiff's release from her active duty tour as the officer in charge of the Camp Lejeune Tax Center was voluntary. "We cannot interfere in the business of the military unless there is a violation of statute or regulation or abuse of discretion amounting to legal error." Curry v. United States, 221 Ct. Cl. 741, 746, 609 F.2d 980, 983 (1979) (citing Boyd v. United States, 207 Ct. Cl. 1 (1975), cert. denied, 424 U.S. 911 (1976)). Because of the plaintiff's waiver of sanctuary and voluntary separation from active duty, this court lacks jurisdiction over plaintiff's claim. This determination by the court does not, of course, preclude plaintiff from pursuing, and qualifying for, a normal reserve retirement.

**c. Allegations of Government Misrepresentation**

Plaintiff also argues that she was misled by the Marine Corps and that, therefore, her separation was involuntary. "Plaintiff's express position in this litigation is that had she known the waiver was of no legal authority, she would not [have] considered it binding. Therefore, she would not have expressed any intention to separate from the military. Even

the communications she made to the military to the contrary were based on the faulty premise that the waivers were valid. She believed that the only way to obtain ADSW [Active Duty for Special Work] was to sign the waivers."

In the context of an involuntary separation, the term "involuntary" means "'contrary to his [or her] own choice, preference and desire' of which the Navy was aware." Green v. United States, 17 Cl. Ct. 716, 719 (1989) (quoting Mansell v. United States, 199 Ct. Cl. 796, 801, 468 F.2d 933, 936 (1972) (per curiam)), aff'd, 925 F.2d 1480 (Fed. Cir. 1991), cert. denied sub nom. Wilson v. United States, 501 U.S. 1217 (1991). The United States Court of Appeals for the Federal Circuit, the United States Court of Federal Claims, as well as their predecessors, have repeatedly found that a decision to resign or retire is presumed to be voluntary. Carmichael v. United States, 298 F.3d at 1372; Tippett v. United States, 185 F.3d at 1255; Schultz v. United States Navy, 810 F.2d 1133, 1135-6 (Fed. Cir. 1987); Covington v. Dep't of Health and Human Servs., 750 F.2d 937, 941 (1984); Christie v. United States, 207 Ct. Cl. 333, 338, 518 F.2d 584, 587 (1975); Moody v. United States, 58 Fed. Cl. at 524; Gavin v. United States, 47 Fed. Cl. at 490; Heaphy v. United States, 23 Cl. Ct. 697, 700 (1991), aff'd, 972 F.2d 1355 (Fed. Cir. 1992) (table). A plaintiff, however, may rebut the presumption of voluntariness by presenting evidence to demonstrate that the resignation was offered under duress, caused by the government's coercive acts, or that the resignation was the result of government misrepresentation. Carmichael v. United States, 298 F.3d at 1372 (holding an otherwise voluntary discharge may be rendered involuntary if it is obtained as a result of wrongful government action such as duress or coercion); Moyer v. United States, 190 F.3d at 1314, 1320 (noting that a resignation is presumed to be voluntary, but can be rebutted by a showing of government misrepresentation); Covington v. Dep't of Health and Human Servs., 750 F.2d at 941-42 (noting that "the decision must ultimately be the employee's decision, not the government's; whether the employee made an informed choice is the touchstone of our analysis.") (citing Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983)); Roskos v. United States, 213 Ct. Cl. 34, 39-40, 549 F.2d 1386, 1389-90 (1977); Sinclair v. United States, 66 Fed. Cl. at 492; Gavin v. United States, 47 Fed. Cl. at 490; Gallucci v. United States, 41 Fed. Cl. 631, 638 (1998). "For the purposes of establishing jurisdiction based on a retirement rendered involuntary because of misrepresentation, plaintiff must show that 'specific misinformation, deception or improper advice' was given that would have misled a reasonable person and that plaintiff relied on the misinformation." Lynn v. United States, 58 Fed. Cl. 797, 801 (2003) (quoting Heaphy v. United States, 23 Cl. Ct. at 702). "The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary." Covington v. Dep't of Health and Human Servs., 750 F.2d at 942. Furthermore, the petitioner, in good faith, justifiably must have relied on the misrepresentation to his detriment. Scharf v. Dep't of the Air Force, 710 F.2d at 1575 (finding agency counselor's statement affirmatively misled the petitioner, and materially affected the petitioner's decision regarding retirement).

A voluntary decision to retire or resign is not rendered involuntary simply because the service member faced a difficult situation in which his choice was limited to one of two unpleasant alternatives. See Schultz v. United States Navy, 810 F.2d at 1136-37; Sammt v. United States, 780 F.2d at 31-32 (stating in a military pay case, "we conclude as we have in civilian pay cases, that the exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative"); Covington v. Dep't of Health and Human Servs., 750 F.2d at 942.

While plaintiff argues that this court's focus must rest on the validity of the waiver itself, "[t]o determine whether a resignation or retirement is voluntary, a court must examine 'the surrounding circumstances to test the ability of the employee to exercise free choice.'" Scharf v. Dep't of the Air Force, 710 F.2d at 1574 (citing Perlman v. United States, 203 Ct. Cl. 397, 407-08, 490 F.2d 928, 933 (1974)). Plaintiff argues that she had no choice but to leave active duty on May 26, 2000, that once she accepted the active duty orders on March 3, 2000, she was required to perform the duties described, separate from active duty at a specified date, and sign a Certificate of Discharge/Separation upon the termination of her active duty orders. The issuance of "active duty training tours for Reserve members," however, is of a "consensual nature." Green v. United States, 17 Cl. Ct. at 719. Further, as plaintiff's counsel conceded during oral argument, plaintiff was not required to accept the Active Duty for Special Work orders in the first place. Also, since COL Brookins accepted the waiver provision in her active duty orders and did not notify the military of an objection to being released from active duty at the end of the orders, the military could not consider her separation to be involuntary. See Green v. United States, 17 Cl. Ct. at 719 (emphasizing that for a release to be involuntary, the military must have prior knowledge of a reserve member's desire to continue on active duty).

In Merriott v. United States, the United States Court of Claims rejected plaintiff's claim and explained that:

> There is no allegation or showing that, at or about the time of his release, plaintiff [a reserve officer on active duty] objected to being released or sought to remain in the Army. Without some such timely objection, or other special circumstances not alleged here, he must be considered to have accepted the release and waived any invalidity.

Merriott v. United States, 163 Ct. Cl. 261, 264 (1963), cert. denied, 379 U.S. 838 (1964). Similar to the plaintiff in Merriott, COL Brookins did not inform the Marine Corps of her objection to being separated from active duty before or at the time she accepted the orders, and did so only after her separation occurred.

The United States Court of Claims, in Mansell v. United States, held that a Navy reserve officer was involuntarily released from active duty because he was released eight months prior to the scheduled expiration of his orders, contrary to the reservist's "own choice, preference and desire." Mansell v. United States, 199 Ct. Cl. 796, 801, 468 F.2d

933, 936, (1972). The Court of Claims, in Mansell, also noted that a reservist's release in accordance with his active duty orders is voluntary, even if the reservist expressed a desire at the end of the active duty tour to extend his active duty orders past the specified separation date. Id. at 802, 468 F.2d at 936. Under the guidance in Mansell, since COL Brookins was released in accordance with her active duty orders, her release was voluntary.

The plaintiff argues that by the defendant misrepresenting that the waiver of sanctuary was valid, the defendant rendered her otherwise voluntary separation involuntary. Plaintiff's counsel argues that "she would not have docilely left active duty," and concluded that "[e]ven the communications she made to the military to the contrary [that she would not claim sanctuary] were based on the faulty premise that the waivers were valid. She believed that the only way to obtain ADSW [Active Duty for Special Work] was to sign the waivers." Plaintiff asserts the defendant's alleged misrepresentation is material because it concerns the consequences of the termination of her active duty tour at Camp Lejeune.

Plaintiff relies on the Tippett, Covington, Scharf and Roskos cases, cited earlier, for support of the proposition that the defendant's misrepresentation was material. See Tippett v. United States, 185 F.3d at 1258; Covington v. Dep't of Health and Human Servs., 750 F.2d at 942; Scharf v. Dep't of the Air Force, 710 F.2d at 1575-76; Roskos v. United States, 213 Ct. Cl. at 40-41, 549 F.2d at 1389-90. The Tippett, Scharf, Covington, and Roskos cases were all favorable to plaintiffs, but are distinguishable from the present case because in those cases the courts found detrimental reliance on the part of the plaintiff.

In contrast, COL Brookins did not detrimentally rely on the Marine Corps' actions with respect to issuance of her active duty orders. Instead, she was faced with the alternatives of accepting active duty orders, or not, and made her own choice to accept the orders with a waiver of sanctuary provision included. COL Brookins' case is analogous to the Christie and Gallucci cases. Christie v. United States, 207 Ct. Cl. at 338, 518 F.2d at 587; Gallucci v. United States, 41 Fed. Cl. at 634-36, 640-41. In Christie, after plaintiff learned that she had been issued a proposed discharge for cause, she attempted to submit a resignation conditioned by her allegation that the resignation was being tendered under duress. After the Navy refused to accept the conditioned resignation, Ruth Christie tendered a resignation without protest. Subsequently, Ms. Christie filed a claim alleging that her resignation from the United States Navy was involuntary because the totality of the events surrounding her resignation evidenced a denial of any viable choice but to resign. Christie v. United States, 207 Ct. Cl. at 336-37, 518 F.2d at 586-87. The opinion in Christie stated:

> While it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports CSC's [the Civil Service Commission's] finding that plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed

> discharge for cause. The fact remains, plaintiff had a choice. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.

Christie v. United States, 207 Ct. Cl. at 338, 518 F.2d at 587.

In Gallucci v. United States, 41 Fed. Cl. at 634, nonjudicial punishment was imposed on Captain Gallucci, "a former Captain in the United States Marine Corps," after he assaulted another service member. Id. at 634. Consequently, "his supervisors advised [Captain Gallucci] to elect voluntary resignation under the Voluntary Separation Incentive ('VSI') program rather than face the consequences of an anticipated recommendation for administrative discharge." Id. An administrative discharge would have rendered Captain Gallucci ineligible "for the benefits of the VSI program." Id. at 635. "Faced with the choice between voluntary resignation and the uncertain consequences of [a] recommendation for administrative separation, [Captain Gallucci] assert[ed] that he 'was on the horns of a dilemma'" since he "did not want to separate from the military and end his Marine Corps career under either circumstance." Id. Captain Galluci, nevertheless, submitted an application to the VSI program, accompanied by a signed statement which specifically maintained:

> I [Capt. Anthony M. Gallucci] am aware of the program benefits and am making this decision to leave the Marine Corps voluntarily based on no promises or information other than the program benefits as approved this date.

Gallucci v. United States, 41 Fed. Cl. at 636 (brackets in original). Captain Gallucci acknowledged that "he was also aware of a directive which stated in relevant part: '[O]fficers are reminded that the decision to apply for VSI . . . is a final and irrevocable decision to leave the active component of the Marine Corps. Requests to withdraw applications will not normally be approved.'" Id. at 636 (omission in original). Captain Gallucci, nevertheless, "made several attempts to vitiate his resignation," including a request to the Commandant of the Marine Corps, "six days prior to his separation date," that he be permitted to "cancel his VSI application and withdraw his resignation." Id. at 636, 640. Subsequent to the denial of his request by the Commandant of the Marine Corps, Captain Gallucci became aware of Marine Corps Order (MCO) 1900.16D, ¶ 5004.2, which stated that:

> When an officer's resignation has been accepted by the Secretary of the Navy, the officer shall be separated from the service at a date specified by the [Commandant of the Marine Corps]. A request for withdrawal of a resignation may be made at any time prior to 45 days from the effective date of the

> resignation or commencement of separation leave . . . . MCO 1900.16d, ¶ 5004.2.

Galluci v. United States, 41 Fed. Cl. at 640. Captain Gallucci argued "that he received insufficient information regarding the VSI program prior to making his decision to resign because he was not informed of this 45 day rule. Therefore, he claims, he was falsely informed that his VSI application was final and involuntary." Id. The court in Gallucci held that Captain Gallucci "was not misinformed with regard to the procedure for avoiding the VSI contract" and that, further, he "cannot be granted relief simply because he failed to more fully educate himself as to the law, and later wishes to revisit his voluntary choice." Id. at 641 (citing Bergman v. United States, 28 Fed. Cl. 580, 589 (1993)).

The record before this court indicates that in addition to the absence of any misrepresentation regarding the validity of the waiver of sanctuary, included in COL Brookins' orders, significantly, unlike the plaintiffs in Tippett, Covington, Scharf, and Roskos, COL Brookins did not detrimentally rely on the Marine Corps' actions with respect to issuance of her active duty orders. Instead, like the plaintiff in Christie, COL Brookins had a choice between several alternatives. Furthermore, like the plaintiff in Gallucci, who was aware of a directive stating that requests to withdraw Voluntary Separation Incentive applications will not normally be approved, the record indicates that COL Brookins was well aware that the Marine Corps was not willing to issue active duty orders to her without the inclusion of a waiver of sanctuary provision. If COL Brookins had not wished to waive sanctuary and not occasion separation from active duty on May 26, 2000, she had the option to decline the Active Duty for Special Work orders or, to object to the waiver provision, causing her request for orders to be forwarded to the Commandant of the Marine Corps for Reserve Affairs for review, pursuant to paragraph 3109.2b of the Marine Corps Reserve Administrative Management Manual. MCRAMM, MCO P1001R.1J, ¶ 3109.2b.

Plaintiff's active duty orders cited 10 U.S.C. § 12686(b) and indicated that the orders were in accordance with the MCRAMM. The MCRAMM directed the screening of "Reserve personnel to preclude them from participating on active duty in excess of 18 years of active federal service and provided specific guidance and criteria for the issuance of orders to this population." MCRAMM, MCO P1001R.1J, ¶ 4(g). As a Lieutenant Colonel at the time, and trained professional in the specifics of tax law, COL Brookins knew or should have known the provisions included in section 12686(b) and the relevant MCRAMM sections. COL Brookins expressed her desire to utilize her tax expertise at Camp Lejeune and willingly accepted active duty orders, which included a waiver provision and a requirement for separation from active duty on May 26, 2000. Like the plaintiff in Gallucci, COL Brookins "cannot be granted relief simply because [she] failed to more fully educate [herself] as to the law, and later wishes to revisit [her] voluntary choice." Gallucci v. United States, 41 Fed. Cl. at 641. Her separation from active duty, therefore, was voluntary.

The court will not overturn the agency decision in COL Brookins' case, also supported by the three military inputs to the BCNR, arguing for a denial of plaintiff's sanctuary request, despite rejection of the recommendation by the BCNR. The Naval

Reserve Affairs Personnel Management Branch input, dated August 14, 2001, indicated that the Marine Corps issued active duty orders to the plaintiff after receiving multiple assurances from her that she would not claim sanctuary. The November 2, 2001, input from the reserve personnel office noted that plaintiff "personally stated to Lieutenant Colonel Lake and members of MCB Camp Lejeune HQ staff, several times, both over the phone and in person, that she had no intention of declaring sanctuary." The Staff Judge Advocate to the Commandant of the Marine Corps's input, dated March 29, 2002, characterized plaintiff's assertions that she would not claim sanctuary as "exhaustive, explicit, and persuasive . . . ." As the United States Court of Appeal for the Federal Circuit has stated, [o]ne who voluntarily gives up any right to compensation and benefits cannot later claim entitlement to such." Moyer v. United States, 190 F.3d at 1318. Also, having previously accepted active duty orders which included waiver of sanctuary provisions, plaintiff's misrepresentation claim is unpersuasive.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss for lack of jurisdiction is, hereby, **GRANTED**. The parties' cross-motions for judgment on the administrative record, therefore, are **MOOTED**. The clerk's office shall dismiss the plaintiff's complaint, with prejudice. No costs.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**